UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

ROANE COUNTY, TENNESSEE,                    )
THE CITY OF KINGSTON, TENNESSEE,            )
and THE CITY OF HARRIMAN,                   )
TENNESSEE,                                  )
                                            )
        Plaintiffs,                         )
                                            )
        v.                                  )   No. 3:-19-cv-206 TAV-HBG
                                            )
JACOBS ENGINEERING GROUP, INC. and          )
THE TENNESSEE VALLEY AUTHORITY,             )
                                            )
        Defendants.                         )

---

## AMENDED COMPLAINT

---

Come now the Plaintiffs, by and through counsel, pursuant to law, to file this Complaint and state as follows:

## PREAMBLE

With regard to all allegations contained herein, Plaintiffs submit that Roane County and its Plaintiff municipalities are wonderful communities with incredible people, services, educational institutions, recreational programs, parks and locations; and each has been and continues to be collectively damaged as to be discussed; and would not have suffered unfair negative stigma as desirable communities but for the prior spill(s), continuing spills and fly ash migration that occurred up to and including 2018. The stigma surrounding the spill caused

negative economic detriment on a County-wide scale that was caused and enhanced by fraud and other conduct to be referenced by similar actions in law and fact committed by the Defendants. Such actions have harmed the communities to such a great extent that legal action must be maintained and should be consolidated as a matter of law. Moreover, people who frequented or resided in a confined area near the spill would not have been harmed in health, or otherwise, had the fraudulent conduct not occurred. This action is such that since the defendants have fraudulently deviated from their obligations in law and in contract in a continuous ongoing nature, plaintiffs were left with no alternative other than to seek access to the Court to protect their governmental public interest as well as their common obligation to protect their citizens' economic and health interests. Further, the governmental entities sue directly to recover lost tax revenues both past and future, for infrastructure, local schools, business, recreation, development, public medical and ongoing emergency response costs, environmental testing, and all other services naturally incurred by the Plaintiffs to their citizenry as set forth herein.

## CLASS ALLEGATIONS

The citizens public interest as well as the interest of the representative Plaintiffs are common in law and fact to the extent governmental representation of their mutual interest is the best mechanism to protect their citizens and serve the interest of judicial economy. Plaintiff's jointly move for class certification for Roane County to represent the municipal plaintiffs and all citizens pursuant to Fed. R. Civ. P. 23, and move for certification based upon the following grounds so deemed as appropriate by the Court:

A)      Based upon the degree of numerosity class certification serves the best interest of all parties and Judicial Economy.

B)      There is a typicality of all claims with many being interdependent accompanied by concrete injury caused by the defendants.

C)      There exist common questions of law, fact, and concrete injury caused by the Defendants.

D)      The Plaintiff's are in the best position to fairly and adequately represent the citizens.

E)      If representational status is not granted through Class status there is a risk of inconsistent verdicts.

F)      Due to the commonality of claims, law, and fact representational representation by the Plaintiff's is the superior means of adjudication.

G)      The amount of controversy that exist is in excess of sixty three million dollars ($63,000,000.00).

H)      The Plaintiff's have standing to act for the people as Plaintiffs who are accountable to their residents and a consolidated representative action is the best method to protect the governmental community interest based upon the previously referenced and to protect public health, safety, welfare, economic, and physical well being, and all injuries which are similar in nature.

I)      Alternatively, pursuant to their previously referenced statutory authority, the Plaintiffs move for consolidation of liability pursuant to Fed. R. Civ. P. 42.

## THE PARTIES

1.      The Plaintiff Roane County has a population of citizens of approximately 53,000 souls. Plaintiff has a duty to provide a wide range of services to its citizens and residents, including services for families and children, public health, public assistance, law enforcement, and emergency care.  Similarly, both the City of Kingston and the City of Harriman are obligated to provide a similar range of services to its citizens and residents.

2.      Plaintiffs jointly bring this action on behalf of their citizens, employees, and residents and, as such, are entitled to represent all the rights of the communities and the citizenry thereof.  In making certain payments on behalf of its employees and residents, Plaintiffs did not act as a volunteer, but rather acted under compulsion for the protection of their interests.  Additionally, all Plaintiffs and their citizens have suffered grave economic damages as further described herein.

3.      Pursuant to *Tenn. Code Ann*. § 5-1-103, Roane County is a corporation and the members of the legislative body assembled are the representatives of the County and its Citizens, and codified under state law to act on their behalf. *Id*.

4.      Pursuant to *Tenn. Code Ann*. § 6-2-201 and § 5-1-118 Plaintiffs are empowered to utilize their police powers to define and require the abatement of a nuisance and otherwise protect the public health and welfare of their citizens.

5.      The cities of Harriman and Kingston are lawful governing bodies and have all powers to file action on behalf of the entities themselves and their respective citizens based upon all

powers vested in them by the Tennessee State Constitution and the Tennessee Code, including but not limited to *Tenn. Code Ann. § 7-54-101, et seq.*

6.      Defendant Jacobs Engineering Group, Inc. (hereinafter "Jacobs") is a foreign corporation with its principal place of business in Pasadena, California.  Jacobs Engineering Group, Inc., was licensed to do business, and was and is doing business, in the State of Tennessee, Roane County, and elsewhere, and is directly liable for all actions contained herein.  Jacobs may be served through its Registered Agent for Process, CT Corporation System, 800 South Gay Street, Suite 2021, Knoxville, Tennessee 37929-9710.

7.      The Tennessee Valley Authority (hereinafter "TVA") is, in part, a private entity that began selling fly ash from Kingston commercially for profit during the hazardous waste cleanup, a/k/a asset recovery, unbeknownst to many, and said dollars could have paid for much needed monies to the community to compensate for certain damages that were incurred that were fraudulently concealed.  TVA may be served with process at 400 West Summit Hill Drive, Knoxville, TN 37902.

<u>STATEMENT OF THE CASE</u>

8.      The events described herein took place primarily in the area surrounding the TVA KIF Superfund Cleanup Site which Defendants referred to as an asset recovery.

9.      The asset recovery occurred and continues to occur to the present day, due in part to hidden, ongoing, and recent secret leaks of fly ash constituents, including radiation and arsenic into the surrounding groundwater above permissible exposure limits.

10. The leaks and publicity surrounding the largest environmental disaster in United States history have negatively stigmatized Roane County, Tennessee, and the surrounding community in its entirety.

11. This nuisance has been unfairly aggravated by a stigma attaching to the community and other material factors.

12. The nuisance could and should have been limited in geographic scope impacting a smaller area of the county but for the actions of the defendants.

13. Defendants are subject to and bound by continuing obligations of the EPA's Administrative Order of Consent ("EPA AOC").

14. Defendants are subject to and bound by continuing obligations of the contract by and between the defendants ("Jacobs / TVA contract").

15. Due to the actions of the Defendants, as further described herein, the entire Roane County community was harmed beyond what would have occurred if a competent and responsible remediator, instead of Jacobs, was performing the clean up task(s) required following the spill with integrity, efficiency, and absent a callous disregard for human health.

16. As a result of the conduct of these defendants, each of the plaintiffs and their citizens are damaged proprietarily, economically, and medically, and have further suffered aggravation and inconvenience.

17. Defendants actions, as described herein, are on-going and daily increase the damages suffered by Plaintiffs.

18. Jacobs was the prime contractor at the KIF cleanup and was to abide by the EPA Agreed Order of Consent ("EPA AOC"), the TVA contract ("Jacobs / TVA contract") and the site wide safety and health plan ("SWSHP") to manage the site clean up and provide a safe environment for the surrounding community that could be exposed to the constituents of the fly ash due to activity at the KIF toxic spill remediation site.

19. The Defendants were under a legal obligation to preserve certain evidence, but instead destroyed it.

20. At all times material herein, Jacobs acted outside the scope of direction of the EPA, TDEC, existing law, and the authority conferred by contract with the TVA, and at all times contrary to the Site Wide Safety and Health Plan (SWSHP).

21. The SWSHP was to be strictly followed and was a mandate to be followed by all who worked on or near the site, but yet it was never disseminated by these Defendants.

22. Jacobs was to provide complete safety oversight for TVA and the EPA.

23. The SWSHP was designed to be mandatorily followed for the safety of the public but it was hidden from them by these Defendants.

24. Defendant Jacobs drafted the SWSHP primarily with the approval of Defendant TVA.

25. TVA and Jacobs crafted a bonus and compensation structure that encouraged the pursuit of profit over considerations of safety.

26.     Jacobs was at all times to operate independently and was contracted by the TVA to use their expertise to employ qualified individuals with professional competence to protect the public.

27.     The personnel provided by Jacobs did not have the requisite expertise.

28.     Jacobs intentionally and recklessly deviated from the scope of authority set forth in the contract with TVA, the EPA Administrative Order of Consent and the SWSHP.

29.     The actions of defendant Jacobs were in direct conflict with these orders and contracts.

30.     A limited number of TVA agents or employees unduly influenced decisions regarding Jacobs obligations to disregard safety in the pursuit of profit, e.g. their own personal bonuses.

31.     The TVA recklessly/negligently selected Jacobs as the prime contractor for the site.

32.     The TVA recklessly/negligently failed to properly interact with Jacobs to the extent that TVA was placed on constructive notice of the hazardous conditions of the site and the danger to the community surrounding the site.

33.     The inactions by the TVA under the circumstances in which they were involved in the largest environmental disaster in U.S. history proximately caused or contributed to all allegations of damages to these plaintiffs and their citizens contained herein.

34.     The inactions by the TVA were egregious breaches of duty the TVA owed to these plaintiffs and their citizens.

35.     Jacobs was not to deviate from their legal and contractual obligations no matter who from within the TVA sought to influence them.

36.     The EPA, the TVA, individual Residents, Citizens, and nearby landowners depended upon Jacobs to act in good faith, with competence, knowledge, integrity, professional skill, and independence free from improper influence regarding the safety of fly ash to workers and the public.

37.     The EPA, the TVA, individual Residents, Citizens, and nearby landowners relied to their detriment upon Jacobs to act in good faith, with competence, knowledge, integrity, professional skill, and independence free from improper influence regarding the safety of fly ash to workers and the public

38.     Jacobs acted with callous disregard for the health and lives of the citizens of Roane County, Tennessee.

39.     Jacobs was aided in their actions and inaction by certain agents for the TVA, including, but not limited to, Ms. Anda Ray, who made misleading statements to the plaintiffs and the community as a whole as regards the safety of fly ash.

40.     These plaintiffs and their citizens relied to their detriment on the representations by the TVA and Jacobs that fly ash was safe.

41.     These plaintiffs and their citizens did not know and could not have known the truth about the dangers of fly ash prior to November 7, 2018 when a jury in *Adkisson v. Jacobs*, EDTN 3:13-cv-505 determined that fly ash was capable of causing hypertension, coronary artery disease, lung cancer, leukemia and other hematologic malignancies, skin

cancer, allergic contact dermatitis, peripheral neuropathy, asthma, chronic obstructive pulmonary disease, and respiratory conditions, including cough, sore throat, dyspnea on exertion, chest pain or discomfort, bronchitis and emphysema.

42.  By law, Jacobs and all agents for TVA were responsible for providing accurate information about the safety of fly ash to all of Roane County, the State of Tennessee, and the TVA Board Of Directors.

43.  The duty to accurately and truthfully report to Roane County, the State of Tennessee and the TVA Board of Directors gives rise to the claims of the Plaintiffs for the protections of its respective citizens' interest.

44.  The defendants were required to report accurately and truthfully regarding all work and communication subject to the requirements of the EPA AOC and comply with law, subject to criminal penalty.

45.  Jacobs adopted a Site Wide Safety and Health Plan ("SWSHP") in part to appropriately disseminate truthful and accurate information relevant to cleanup of this environmental contamination/remediation project to the public during the asset recovery.

46.  Jacobs adopted a Site Wide Safety and Health Plan ("SWSHP") in part to appropriately and properly monitor the air for the benefit of the TVA and Roane County communities.

47.  Jacobs mandatory obligation was to protect the taxpaying citizens of Roane County as a highest priority, workers at the Site, and the general area in order to protect and restore portions of property and environment damaged by the Kingston (KIF) ash spill.

48.     The TVA contract with Jacobs was one in which the TVA contractually granted and relied upon Jacobs' independent decision-making for safety and management of the entire site as the "independent contractor."

49.     All actions described herein were recklessly or intentionally committed by Jacobs upon Plaintiffs.

50.     Jacobs' actions were totally outside the contracted scope and knowledge of the TVA Board of Directors.

51.     Jacobs' actions were done, in part, to receive approximately sixty three millions of dollars ($63,000,000.00) in contract payments and bonuses.

52.     Jacobs' actions and inactions violated existing law, the EPA AOC, the TVA contract requirements, the SWSHP and common decency.

53.     Despite Jacobs' duties under this multi-million dollar agreement with TVA, it acted outside the scope of the TVA Board of Directors, the EPA AOC and exceeded its authority by fraudulently manipulating, destroying, and falsifying air monitoring results.

54.     Further, upon knowledge, information and belief, Jacobs made numerous representations to the TVA and others that fly ash was not harmful to human health.  These representations are contrary to the safety plan documentation adopted, created, and possessed by Jacobs and TVA in violation of the law.

55. Jacobs and certain agents of TVA, without the knowledge of the TVA Board of Directors, knowingly and intentionally lied to the plaintiffs, their citizenry and communities about the safety of fly ash constituents.

56. These actions fell outside the scope of the authority conferred by the TVA Board of Directors, the EPA Order of Consent, and the law.

57. Jacobs' actions and inactions contributed to community aggravation and inconvenience, loss of governmental property values, lost tax revenues, and certain health care and emergency response costs.

58. Jacobs' intolerable conduct includes violations of law, including, but not limited to, ongoing continuing obligations pursuant to the Administrative CERCLA Order # -04-2009-3766, the EPA AOC, the law, and matters of contract that have continued and affect the plaintiffs up to the present day.

59. TVA obstructed the truth from the plaintiffs by illegally destroying video evidence.

60. Jacobs colluded and conspired to commit the same transgressions to conceal video evidence.

61. Defendants have spent large quantities of ratepayer monies attempting to hide the truth regarding the "safety" of fly ash.

62. These defendants have engaged in fraud, fraudulent concealment, violations of Federal and State statutes and regulations, outrageous conduct, promissory estoppel, detrimental reliance, negligent selection of Jacobs Engineering Group,Inc. as its Site Wide Safety

Contractor, temporary nuisance due to the hidden dangers of the ash and the recent 2018 secret release of high levels of radiation and arsenic from KIF, reckless endangerment, obstruction of justice, and breach of contract as the Plaintiffs were known intended direct third party beneficiaries to the contractual agreement between TVA and Jacobs.

63. Jacobs intentionally altered environmental test procedures and induced these plaintiffs and the public at large to rely on the altered, inaccurate information reported.

64. The EPA determined that communications related to the spill at KIF and any other releases were to be open, honest, responsible, reasonable, scientifically reliable, and done in such a manner that is value laden with honesty of the health risk to protect individuals in reasonable proximity to toxic or hazardous substances contained in the ash.

65. TVA and Jacobs did not comply with their legal or contractual obligations to the rate-paying plaintiffs and their citizens.

66. Defendant TVA, in violation of numerous required legal disclosures, fraudulently sold and auctioned for sale homes and property following the spill and concealed from the buyers that the property and homes were toxic.

67. Defendants engaged in fraudulent concealment of the dangers of the fly ash and outrageously told the plaintiffs it was safe and maintain this position to this day despite the verdict in *Adkisson*.

68. As a result, the TVA, in failing to select a qualified prime contractor or safety contractor with specific extensive experience in the remediation of fly ash spills, TVA breached their

promise to the citizens of Roane County, Tennessee, Harriman and Kingston who are direct third party beneficiaries to the Jacobs contract.

69. Jacobs was not qualified nor competent to do the job as marketed, bid for, and promised

70. TVA promised to pay the medical expenses for people affected by the spill.

71. Plaintiffs reasonably relied on TVA's promises, and as a result of this reliance, the good citizens of Roane County altered their approach to their own healthcare needs.

72. The misrepresentations of Jacobs and the TVA had the net effect of covering up information used by physicians to treat plaintiffs' citizens.

73. The TVA and Jacobs were ordered to protect the public pursuant to Administrative Order # -04-2009-3766 and law.

74. The defendants did not protect the public.

75. As a result of the improper repair of the fly ash impoundment a more recent and ongoing nuisance has arisen.

76. Jacobs as the prime contractor and site manager is liable.

77. TVA through its selection of Jacobs as the prime contractor is liable and must be included herein as an indispensable party.

78. The current leak contains unacceptable levels of Arsenic and Radiation which are seeping into the groundwater and the Emory and Clinch rivers in Roane County, Tennessee.

79. The TVA attempted to hide this information from the general public for months prior to the filing of this lawsuit.

80. The TVA public relations department, often in conjunction with Jacobs, made representations to citizens and public officials that were fraudulent.

81. The fraudulent statements were not discovered as such until a jury determined otherwise on November 7, 2018.

82. Public officials and Roane County citizens reasonably relied on the publicly disseminated information provided by the TVA and Jacobs.

83. These defendants conspired to keep secret from the public the constituents of the fly ash and that the fly ash contained radioactive material all of which is harmful to human health and the plaintiffs and their citizenry.

84. These defendants conspired to keep secret from the public the constituents of the fly ash knowing that many living near and the remediation workers would need money for burdensome medical expenses and accurate information to relay to individual treating physicians to get proper medical care from problems caused by the fly ash.

85. The promise of truthful disclosure of information was breached by Ms. Anda Ray and Public Relations Officer Scott Brooks and the breach has continued till this day at local Roane County meetings and the media.

86. Ms. Ray as an agent of the TVA promised that the TVA would pay the medical expenses of those people affected by the spill.

87.  Ms. Ray promised that the fly ash was safe.

88.  All Plaintiffs' governmental officials tried to protect the citizens of Roane County, but they were continuously lied to, in violation of law.

89.  These officials relied upon Defendants' repeated false statements, thus inducing them to refrain from taking legal action against the defendants.

90.  This reasonable reliance and forbearance by Roane Officials harmed the whole community.

91.  Had these Defendants conducted themselves in accordance with the law, the health problems and temporary nuisance stigma with the incurred damages would not have occurred.

92.  Considering all allegations in this complaint, it is averred that Jacobs bears primary responsibility because they were the site wide safety contractor designated to independently manage safety at the site.

93.  Based upon contract language, if any individual or entity were to engage in conduct contrary to AOC -04-2009-3766, Defendant Jacobs was required to do their primary job to protect human health and comply with law.

94.  Jacobs outrageously did not protect human health and comply with the law.

95.  In short, converse to other contractors that normally engage in similar forms of contracting, Jacobs, in the present action, actually acted in direct conflict with federal law

and the TVA policy to such a criminally gross extent that it should not be tolerated by any just and civilized society.

96.    By engaging in the conduct enumerated in this Complaint, Defendants violated the following non-discretionary requirements of the law:

a.    42 U.S.C. 7401, *et seq.*

b.    *Tenn. Code Ann.* S 39-13-101;

c.    *Tenn. Code Ann.* § 39-13-103;

d.    *The Tennessee State Air Pollution Control Regulations*

e.    *Tenn. St. Reg.* 1200-3-3;

f.    *Tenn. St. Reg.* 1200-3-5;

g.    *Tenn. St. Reg.* 1200-3-8;

h.    *Tenn. St. Reg.* 1200-3-10;

i.    *Tenn. St. Reg.* 1200-3-11;

j.    *Tenn. St. Reg.* 1200-3-12;

k.    *Tenn. St. Reg.* 1200-3-13;

l.    *Tenn. St. Reg.* 1200-3-19;

m.    *Tenn. St. Reg.* 1200-3-22;

n.    *Tenn. St. Reg.* 1200-3-37;

o.    *Tenn. St. Reg.* 1400-15-01-.02; and

p.    SARA Title III, *The Emergency Planning Community Right to Know*;

q.    18 U.S.C. 1961-1968;

r.    33 U.S.C. 1251 et seq.;

s.    42 U.S.C. 9601 et. seq.;

t.    42 U.S.C. 6901 et. seq.;

u.    40 C.F.R. 430(c);

v.    SARA Act Title III (EPCRA) 42 USC 11001, et seq. (entitling Plaintiffs to all fines and damages)  and related to reasonable response costs Plaintiffs incurred.

w.    *Tenn. Code Ann.* 50-3-2001 *et. seq.*

x.    *Tenn. Code Ann.* 39-13-103;

y.    *Tenn. Code Ann.* 39-14-114;

z.    *Tenn. Code Ann.* 39-14-903;

97.    The effects of continued exposure to such hazardous substances proximately caused some citizens to contract illnesses from which they will never recover.

98.    The healthcare costs incurred by these Plaintiffs and citizens are astronomical in amounts of dollars.

99.     The defendants actions caused damages to the Plaintiffs requiring, measurable and fair, medical and scientific response costs on behalf of its citizens.

100.    Damages incurred by the Plaintiff's include, but are not limited to, an unfair negligent temporary nuisance incurred by Plaintiffs.

101.    This temporary nuisance has been enhanced by ongoing negligent leaks of toxins at KIF, other damages from the temporary nuisance created by the Defendants, violations of the ECPRA through SARA Title III, CERCLA, and RCRA, violating many provisions an Administrative Court Order, including, but not limited to, destroying evidence and witness tampering.

102.    The actions and inactions of Defendants have culminated in extensive harm to the reputation of Roane County, the City of Harriman and the City of Kingston visiting each with an unfair stigma causing economic damage to each.

103.    The actions and inactions of Defendants have culminated in extensive harm to the health of individuals living within an area limited in geographic scope near the spill.

104.    Aside from this limited area, the rest of Roane County is one of the most beautiful and desirable communities in the country.

105.    Defendants' actions have caused a negative impact upon the County and its municipalities.

106.    The outrageous acts of these Defendants have caused and continue to cause a substantial reduction in the tax revenues for the Plaintiffs that would have been appropriated to the

schools, infrastructure, recreation, business ventures, and various other monetary allocations for community development and enhancement.

107.   Defendants provided inadequate responsive medical monitoring in the aftermath of the spill for the Citizens of Roane County, especially those approximately 8,000 people living within a reasonable geographic zone of the spill.

108.   The people within this region had the likelihood, probability, or did experience health-related problems from the original spill from the hazardous fly ash constituents.

109.   This inadequacy and dishonesty was outside the scope of authority conferred by the EPA Order of Consent and the law.  TVA knew or should have known of the previous and therefore is complicity liable.

110.   But for the dishonest and reckless actions of the defendants, the spill would have presented a real danger to a reasonably confined geographic region of Roane County and the migration of the ash could have been contained and the damages limited.

111.   Without justification, defendants lied about the safety of the coal ash.

112.   If this would not have occurred, Plaintiffs would not have lost revenues to the extent suffered to date and people in danger could have been aware how best to protect their health.

113.   These ongoing economic losses have once again been aggravated with regard to the recent leaks of high levels of radiation and Arsenic.

114. When this recent hidden leak is combined with an ongoing pattern of dishonesty, it has perpetuated a negative temporary nuisance stigma, for people are in a reasonable reactionary position of not knowing whether they are safe in proximity to this site.

115. The stigma was was created by these Defendants.

116. Particularly, contrary to legal and moral principles, Jacobs and a limited number of certain agents of TVA had in their possession manuals for fly ash safety that contained vital information regarding fly ash toxins and constituents that were not properly disseminated to individuals in Roane County, nor the public, including, but not limited to, medically vulnerable populations (including the interests that are represented by the Plaintiffs).

117. Jacobs created its own Site Wide Safety and Health Plan (hereinafter designated as the SWSHP) that it submitted to TVA for the adoption of the mandatory rules to be followed on site. Jacobs, along with certain agents of TVA, deviated from the SWSHP in such a manner it was a violation of the law. All of these allegations were a factor that caused the damages herein complained to one of the most beautiful counties in the country.

118. Internal documents indicate that a false portrayal of a positive health perception of the disaster was more important than actual human health.

119. Samples of fly ash were to be collected in such a manner as to minimize litigation.

120. Samples of fly ash were to be collected in such a manner as to be legally defensible.

121. The perimeter fly ash monitors were soaked in water to lower the readings of toxic levels to misrepresent dangers to the public in favor of profit and avoidance of legal penalty.

122. Air and water samples were destroyed and records of levels destroyed by Jacobs.

123. Videotape and photos of conditions at the site showing vast amounts of airborne fly ash were destroyed by the Defendants in violation of the EPA AOC, the TVA/Jacobs Contract and the law.

124. A prior TVA witness has already truthfully testified in a prior Federal proceeding that this would be outside the scope of the Court Order #-04-2009-3766 and the Defendants' ongoing legal and moral obligations.

125. This Order was required to be followed by law, subject to potential criminal penalties, and other laws that forbid such outrageous conduct committed primarily by Jacobs, and certain limited individuals within the TVA.

126. All of these allegations were a factor that caused the damages herein complained to one of the most beautiful counties in the country.

127. Jacobs went to such an extent to to engage in a fraudulent cover up as to conceal their harmful intent that they hired former critical TVA employees, moved certain witnesses around or out of the country, and lobbied to unethically approach and represent fact witnesses with no affiliation to JEG to influence testimony, for which Court admonishment was received.

128. Defendants' statements were so contrary to their public statements it represents the most grotesque of deviations of public decency.

129. In their possession were numerous documents that fly ash constituents can cause cancer, but this was never effectively publicly disseminated.

130. The defendants, despite their knowledge did nothing to prevent exposure to fly ash for these Plaintiffs, and authorized callous cavalier statements that were calculated to mislead the public regarding safety.

131. Statements including "fly ash was so safe you can eat it" was a theme stolen from the defense of other lawsuits involving fly ash that resulted in harm to human health of children and others from fly ash that resulted in findings of liability.

132. This same mantra regarding fly ash was used in this case callously, and went to such an extreme that they endorsed statements in emails such as this related to fly ash causing cancer.

133. One Internal Jacobs/ TVA email regarding the safety of fly ash stated : " However, the more you are exposed, the more likely it becomes….that cancer will grow. It's like buying lottery tickets. If you just buy one ticket you probably won't win. If you buy many tickets, your chances increase." Such was the callous disregard for human life that Jacobs subjected Plaintiffs' citizens to the cancer lottery.

134. Contrary to JEG agents testimony at trial, 2013 communication on or shortly after a lawsuit involving the sick workers was filed indicate that Jacobs emails stated they were

not considering hours of shift exposures during monitoring of the ash, which is an outrageous disregard for human health and life.

135. The Jacobs/TVA contract explicitly stated that JEG was to protect the public as did the Administrative Order of Consent and the other laws referenced herein.

136. Jacobs entered into the business of superfund remediation for monetary profit.

137. Jacobs engaged in dishonest fraudulent business dealings in pursuit of profit to ensnare the TVA rate payers fraudulently and economically.

138. The actions of Jacobs were to be independent, honest, without improper dealing or motives, free from conflict or influence, and to primarily protect human health and the environment.

139. The citizens of the Plaintiffs were within the class of people intended and designated for protection.

140. The Defendants breached this direct intended obligation in law and contract to illegally receive rate payer money through bonuses.

141. The Defendants criminally neglected the people they were appropriated money to protect through their illegal enterprise constituting violations of 18 U.S.C. 1961- 1968 and Plaintiffs request appropriate damages in accordance with the United States Code.

142. A certain limited number of executives of both Defendants violated their own ethics directives of particular concern were a certain limited number of TVA executives who claimed that the constituents of fly ash were not harmful to human health even up until

the present day despite the TVA signing an Agreed Administrative Order of Consent acknowledging fly ash poses an imminent harm to human health and the TVA now posts warning signs that fly ash is hazardous that violate the following provisions of the <u>TVA Executive Code of Conduct</u>, *in pertinent part,* as follows:

    I.    **General Principal.**  TVA executives will hold themselves, and each other, to the highest standards of integrity, honesty and ethical conduct. …

    III…   2.     Foster a culture of honesty, integrity, and ethical and law-abiding behavior among other Executives and employees.

        3.     Take all reasonable measures to achieve responsible use of and control over TVA's assets and resources.  All assets and resources are to be used for legitimate business purposes.

        4.     Provide constituents with information that is accurate, complete, objective, relevant, timely, and understandable.  Assure full, fair, accurate, timely, and understandable disclosure in all filings with regulatory agencies and other public communications. …

        11.     Ensure employees understand their affirmative duty to report actual or suspected violations or laws or ethics requirements and the procedures and mechanisms available to them for reporting.

        12.     Maintain a workplace environment that prevents retaliation or reprisals against an employee who in good faith reports actual or suspected violations of law or ethics requirements.  Retaliation against employees who report perceived violations and/or who participate in investigations as witnesses or in other capacities violates the law and TVA's policies on whistleblowers, expressing differing views and cooperating with the Office of Inspector General.  Such retaliation is prohibited and will not be tolerated.

    IV.    **Implementation**.  TVA Executives are accountable for full compliance with this Code of Conduct….

143.   It was further concealed as corroborated by TVA agents through deposition that during the time of the remediation that the TVA was selling the coal combustion residuals and

specifically fly ash from Kingston (KIF) for money in the commercial setting while TVA was acting as if the remediation was solely funded by rate payer dollars.

144. The TVA classified the costs of remediation a "Regulatory Asset" and the TVA decided to recover the cost of the clean up from the ratepayers.

145. Instead of referring to the site of the largest environmental disaster in U.S. history as a "hazardous waste" site as suggested by the EPA, TVA decided to refer to the "clean up" as an "Asset Recovery."

146. Instead of posting warning signs for the public as recommended by EPA, TVA removed any warning signs at the direction of Anda Ray.

147. Instead of referring to the site as a decontamination project as recommended by the EPA with appropriate site controls, Jacobs' hierarchy, by and through Sean Healey (certified industrial hygienist), failed to provide adequate respiratory protection and air monitoring for the public even though Jacobs knew the particulates from the ash posed dangers to human health and the environment and the asset recovery was directed by Jacobs to be handled so as to limit any public perception of danger.

## FIRST CLAIM FOR RELIEF

### Promissory Estoppel

148. Plaintiffs refer to and re-allege Paragraphs 1 through 147 of this Complaint and incorporate them by this reference, as though fully set forth herein.

149. Jacobs and the TVA knew that their representations, both public and private, to Roane County officials regarding the safety of fly ash were false.

150. Defendants outrageously intended to cause Plaintiffs and others to continue to believe there were no health risks from the fly ash and forego medical evaluation and treatment for monetary gain.

151. Plaintiffs and their carriers improperly incurred the expense, or did so personally for those who were uninsured adding to stress in some instances for those living near the spill.

152. TVA repeatedly and fraudulently promised to pay medical expenses for people whose health was affected by the ash, but led them to believe the ash was safe so they refrained from seeking medical treatment.

153. Instead of keeping this extremely important promise, TVA instead bought two jet planes and Dallas Cowboys owner Jerry Jones helicopter for a grand total of approximately thirty million dollars ($30,000,000.00). These were TVA purchases, however the payment of these bills to keep this promise of perceived moral obligation to those so affected would not have been a direct expense, but one likely from their insurance carrier.

154. Defendants' fraudulent actions caused people to forbear medical examination and to omit relaying exposure information, symptoms, and conditions for medical assistance.

155. The delay in seeking medical attention caused by these Defendants has created a need for enhanced medical response costs and Plaintiffs   relied upon TVA promises to their detriment.

156.    The TVA should be forced to honor its promises and be ordered to pay the related

response damages.

157.    Jacobs, through a Public Relations Director on site, disseminated all site safety

information to the TVA.

158.    Upon knowledge, information and belief, Jacobs never discussed the hazards of fly ash in

safety meetings in which the TVA public relations department or team members

participated.

159.    Ms. Anda Ray and a few select TVA employees, who had to approve both Jacobs and

TVA press releases fraudulently withheld accurate exposure, safety, and health

information from Plaintiffs.

160.    The TVA negligently allowed this to occur with improper supervision over the public

relations department.

161.    Again, the TVA and Jacobs were required by law to be truthful and accurate to assist in

protecting human health.

162.    Plaintiffs, in justifiable reliance upon the climate created by AND THE TVA'S

REPEATED STATEMENTS THAT fly ash in the Defendants' area within a reasonable

circumference of the spill was safe, induced the citizens of the community to forbear

getting proper medical treatment, prevented public health care providers from obtaining

proper information, and substantially increased health care problems and costs.

163.    TVA promised that they would pay for everyone's medical expenses affected by the spill.

164.  As a direct and proximate result of Jacobs' fraud upon Plaintiffs, certain individuals have suffered various diseases and conditions, fear of disease, medical expenses, monitoring costs, pain and suffering, mental anguish, other personal injuries, an unfair community reputation and economic stigma, and other damages, with the exact amount to be proven at trial. .

165.  As part of their marketing scheme, Defendants spread and validated their deceptive messages through the following unbranded vehicles ("the Vehicles"): so-called key opinion marketing that was false about fly ash safety. The Defendants, who wrote favorable false publications journal articles and delivered support of these allegations were a factor that caused the damages herein complained.

166.  Defendants disseminated many of their false, misleading, imbalanced and unsupported messages through publication because they wanted to manipulate trusting observers to believe it was safe in order to meet deadlines for bonuses and benefit through other means.

167.  Through branded and unbranded materials, Defendants presented information and instructions concerning fly ash generally that were false and misleading.

168.  In their promotion of the appropriate handling and testing of the fly ash Defendants knew that their statements were false and misleading, or they recklessly disregarded the truth in doing so, but they continued to publish their misstatements to benefit themselves.

169.   Rather than actually test the safety of fly ash appropriately for long-term exposure problems and release prevention, Defendants led the Plaintiffs and the public at large to believe that the tests were appropriately done.

170.   Defendants created a body of false, misleading, and unsupported medical and popular impression about the fly ash that (a) understated the risks (b) overstated the safety and (c) was likely to alter public perception of the danger posed.  The literature and press releases were, in fact, intended to persuade doctors and the public that the fly ash was safe and minimize the perceived risk of disease and damage.

171.   The extent of Defendants' disseminated and marketed information that was knowingly false, has now been exposed putting the public in a situation of disbelief that certain people and businesses do not want to risk living in in the area of the spill due to Defendants' false representations and exposure that has created confusion and uncertainty.

172.   Upon information and belief, Defendants spent vast amounts of the TVA ratepayers' money to market the deceptive safety of the ash in an attempt to influence the public, healthcare providers, government agencies and officials, and the Plaintiffs which induced them to refrain from taking legal action.

173.   As described in detail simply below, Defendants:

   • Misrepresented the truth about how FLY ASH IS HARMFUL TO HUMAN HEALTH.

   • Misrepresented that the fly ash was being tested appropriately.

• This fraud prevented adequate assessment of the HEALTH risk FROM FLY ASH EXPOSURE in regards to an area reasonably close to the spill.

• These fraudulent action induced doctors, patients, and ratepayers from making/ knowing decisions by use of misleading terms that fly ash is safe.

• Falsely claimed that fly ash (and dust) was adequately managed;

• Misrepresented that exposure doses pose no risks to certain residents who lived or worker in an area close to the spill.

• Falsely omitted or minimized the adverse effects of fly ash exposure and overstated the safety of fly ash and knowingly did not protect from its harm

• All of these allegations were factors that caused the damages herein complained to one of the most beautiful counties in the country.

ALL THESE ACTS CAUSED THE PLAINTIFFS AND RESIDENTS TO RELY REASONABLY UPON THE DEFENDANTS ONGOING FRAUD, CAUSING THE PLAINTIFFS' CITIZENS TO NOT PROPERLY RELAY LEVELS OF FLY ASH EXPOSURE TO HEALTHCARE PROFESSIONALS. THIS CREATED A GREATER CURRENT NEED FOR MEDICAL SURVEILLANCE, HEALTH CARE, AND MEDICAL RESPONSE COSTS THAT TVA HAD PROMISED TO PAY THE CITIZENS OF ROANE COUNTY.

## SECOND CLAIM FOR RELIEF

### Fraudulent Concealment

174.   Plaintiffs refer to and re-allege Paragraphs 1 through 173 of this Complaint and incorporate them by this reference, as though fully set forth herein.

175.   Plaintiffs hereby assert their cause of action for Fraud against the defendants that occurred outside the scope of law, the EPA AOC, and contractual obligations placed upon all who were bound to the TVA/Jacobs contract of which the Plaintiffs and their citizens were direct intended third party beneficiaries and including the ratepayers that were contrary to contractual purpose. Upon information and belief, due to various economic motives, certain TVA agents and employees, a select number of individuals concealed the dangers of the ash and problems associated with the project to their own board of directors.  In so doing, they also acted outside the scope of the EPA AOC, outside the scope of the TVA/Jacobs contract without the true knowledge of others at TVA.  Jacobs was the primary actor in said concealment as referenced in this Complaint. .

176.   Upon information and belief, these limited number of individuals from TVA were motivated by the massive amounts of money and job perks (such as the use of the helicopter purchased from Dallas Cowboy's owner Jerry Jones, and the use of recently purchased jets that equated to a combined total of approximately thirty millions of rate payer dollars ($30,000,000.00), an extravagant salary of eight million dollars of ratepayers' money ($8,000,000.00) in annual payment to its CEO Bill Johnson, none of which was paid by insurance proceeds as the TVA has publicly portrayed in the community).

177.   Jacobs was motivated by a huge bonus structure that ignored accurate safety protective measures to preserve human health and lied about safety at the site continuously.

178.  Upon information and belief, one primary materially motivated employee/agent was Anda Ray, Senior Vice President over the spill, who had an extremely large salary, incredible benefits, and the potential for astronomical bonus dollars.

179.  Upon information and belief, the fraudulent concealment of the toxicity of the ash by Jacobs and certain limited agents of TVA, including Ms. Ray, induced residents within close proximity of the spill to neglect seeking medical evaluation and treatment, and proper relaying of medical history to their doctors for economic gain and to minimize individual suits.

180.  This fraudulent concealment induced the forbearance of people relaying accurate symptoms and also kept them from seeking treatment, amounted to crucial breaches of contractual promises relied upon by those living within a reasonable area from the spill and working on site. This fraudulent concealment was done to protect inordinate bonuses for Jacobs and certain limited people within TVA to receive massive benefits at the ratepayers expense.

181.  As stated, in Jacobs' and TVA's possession were documents that accurately referenced toxic constituents, target organs, and symptoms of the harmful exposure of the fly ash to the members of the community who were exposed to the harmful ash or who lived nearby. One example of such information is entitled "Fly Ash Constituent Information." This information was not properly disseminated in accordance with law to Roane County officials nor the public.  Some of the toxic constituents included, but were not limited to: radium, cesium, uranium, cesium, boron, vanadium, arsenic, silica, mercury, lead,

beryllium, and other constituents some have been historically known to be used in chemical warfare.

182.    Plaintiff's deserved to know and were promised the truth about the "safety" of fly ash.

183.    The fraudulent concealment of this information to protect human health should have been disseminated to community officials and residents in accordance with TVA's safety directives and the Emergency Planning and Community Right to Know Act. Failure to warn by Defendants is a violation of the legal obligations that interfered with the public's right to know in violation of the EPA AOC, OSHA, CERCLA, and RCRA and various other laws that impose these legal duties to the Defendants with regard to the duty to inform and protect the general public.

184.    Furthermore, upon information and belief, the number of toxins, quantity of toxins, routes of exposure, and target organs were recklessly omitted from the initial Site Wide Safety Plans that were drafted for the years preceding 2013.

185.    Certain agents from the TVA and Jacobs should have honored the legal obligation to have truthful, thorough knowledge, and communicate pursuant to the ECPRA, SARA Title III, NCP, 40 C.F.R Part 355 *et. seq.* and NEPA, to the Plaintiffs, this they did not do.

186.    Jacobs knowingly and intentionally lied to subcontractors regarding the safety of the toxicity of the fly ash. Jacobs Safety Manager, Tom Bock, stated you can "EAT A POUND OF FLY ASH PER DAY FOR THE REST OF YOUR LIFE BEFORE IT WILL EVER HURT YOU" – although this is patently untrue.

187.    Jacobs committed fraud by not informing Plaintiffs that the Site did contain toxic constituents or other hazardous substances including radioactive elements.

188.    The information known by Jacobs was concealed falsely and Jacobs acted with reckless disregard as to whether or not its representations were false, as did certain people within TVA.   The TVA failed to prevent the dissemination of false information.

189.    Jacobs failed to use due care and honesty regarding the accuracy of its statements to Plaintiffs and deviated from its own Site Wide Safety and Health Plan and TVA did same trying to enhance their credibility by promises made to the TVA ratepayers and Roane County residents.

190.    The financial contributions to Roane County government may operate as a set-off to TVA, but not Jacobs.

191.    Plaintiffs would have sought economic and medical assessments to appropriately deal with the original ash spill on the Site had they known of the appropriate zone of true airborne contaminants.

192.    Plaintiffs would have sought economic and medical assessments to appropriately deal with the original ash spill on the Site had they known of the dangers of prolonged exposure in response to the spill, the constant manipulation of environmental and health facts, ongoing leaks, and coverups.

193.    As a direct and proximate result of Defendants' on-going fraud upon Plaintiffs, certain members of the community, have illnesses, fear of disease, medical expenses, medical

response monitoring costs, pain and suffering, mental anguish, other personal injuries, and other damages with the exact amount to be proven at trial.

194. Defendants accomplished false perceptions through a coordinated, sophisticated, and highly deceptive marketing campaign that began in the late 1990s and which became more aggressive in or about 2006, and continues to the present.

195. Defendants accomplished their marketing campaign goal by convincing doctors, patients, and others that the fly ash had little, if any, health risks, and that fly ash was safe.

196. Defendants, individually and collectively, knowing that long-term or intense short term exposure causes harm to human health, misrepresented the dangers of long-term exposure to physicians, pharmacists, and patients by engaging in a campaign to minimize the risks of various forms of exposure to the fly ash.

197. All of these allegations were a factor that caused the damages herein complained to one of the most beautiful counties in the country.

198. These Defendants intentionally hid from the public that fly ash was particularly dangerous to children capable of causing birth defects, neurological disorders such as autism, pediatric depression, immunological and other problems and withheld this information from the Roane County Community.

199. The Defendants further withheld information regarding the dangers of fly ash and the methods by which the toxins can be distributed into homes through automobiles, clothing, air migration, and other means to harm children.

200. As a result, the Plaintiff's hereby move the court pursuant to Fed. R. Evid. 201 to take Judicial Notice of the fact that for children so affected or exposed the statute of limitations would not run until one year past the age of majority under *Tenn. Code Ann.* § 28-2-106.

## THIRD CLAIM FOR RELIEF

### Intentional or Reckless Failure to Warn

201. Plaintiffs refer to and re-allege Paragraphs 1 through 200 of this Complaint and incorporate them by this reference, as though fully set forth herein.

202. Defendants breached their duty by not only failing to warn Plaintiffs, but actually fraudulently concealing the fact from Plaintiffs, and, upon information and belief, the TVA Board of Directors.

203. Defendants' breach of the duty to warn caused Plaintiffs to feel comfortable inside the environment containing the ash, without knowing whether it was safe or to seek protection, and to be exposed to high concentrations of toxins during that period of their frequent exposure.

204. Defendant TVA now warns that fly ash is hazardous, despite its numerous prior representations to the contrary.

205. As direct and proximate result of Defendants' reckless failure to warn, Plaintiffs have suffered  injury both economic and personal injury and other community response damages, with the exact amount to be proven at trial.

206. All of these allegations were a factor that caused the damages herein complained to one of the most beautiful counties in the country.

## FOURTH CLAIM FOR RELIEF

### Negligence

207. Plaintiffs refer to and re-allege Paragraphs 1 through 206 of this Complaint and incorporate them by this reference, as though fully set forth herein.

208. Despite Defendant's mandatory obligations, these fly ash constituents and other hazardous substances have remained present in the air, soil, and groundwater, and waterways in Roane County, Tennessee.

209. The TVA recklessly selected Jacobs as its prime contractor and site manager and did not communicate appropriately with safety issues involving the public.

210. The TVA recklessly failed to properly vet Jacobs or their personnel prior to awarding the contract.

211. The TVA recklessly failed to properly require by contract adequate safety precautions and personnel for the citizens of Roane County, Tennessee.

212. The improper negligent handling of the fly ash, caused by Jacobs, resulted in the ash becoming airborne and allowed for windward erosion throughout the Site and Roane County properties, allowing unsafe contact, inhalation, and ingestion.

213. Jacobs recklessly required its subcontractors to wet and suppress fly ash around stationary air monitors and wash the monitors to lower readings so that the public,

including Plaintiffs, would not know how to best respond and protect the people, businesses, and prospective business and residents.

214. These outrageous actions were contrary to Defendants' obligations and scope of law, authority, and any legitimate purpose.

215. Despite Jacobs alleged or imputed knowledge of fly ash hazards and its duty to prevent it from migrating onto as well as into properties nearby in a reasonable area within the spill, the multibillion dollar company did not adhere to this serious duty of protecting human health.

216. Jacobs knew or should have known the dangerous consequences to those living within a reasonable area of the spill.

217. Jacobs was unqualified to undertake the job with the personnel that were involved.

218. The TVA negligently contracted with an inadequate Jacobs and did not protect the public.

219. Jacobs deviated from exercising reasonable judgment by engaging in negligent failure to protect human health, property in the local communities, and tax revenues of the communities, which include funding for schools.

220. The damages alleged herein were caused by Jacobs committing impermissible reckless or intentional deviations from its Site Wide Safety and Health Plan, and damaging the people Jacobs was contractually obligated to protect.

221. Jacobs acted intentionally and recklessly in bad faith disregarding human health, property, and the local business community; which was at the very essence and unique

nature of its purpose of TVA contracting with Jacobs as the complete site wide

"independent contractor" for management and safety.

222.   TVA negligently or recklessly selected Jacobs as its site wide safety contractor based

upon Jacobs' lack of experience in fly ash and CERCLA superfund remediation projects.

223.   The plaintiff communities' health was not protected in an area comprising approximately

8,000 people living close to the spill, some of whom are very sick and suffering

significant medical problems as a proximate result of Jacobs' deviations from the SWSHP

and breaches of the TVA contract.

224.   The medical and economic needs of the community were voluntarily undertaken by the

TVA and were additionally mandated by the EPA AOC.

225.   The TVA should be required to keep their promise to pay responsive individual medical

bills and surveillance for these individuals, and the others who need yearly medical care

for current or future medical response to health issues, including but not limited to,

response cost of future health care evaluations and treatment due to the fraud committed

by the Defendants upon which Plaintiffs were induced to rely.

226.   The Defendants' cover up, as well as the recent leak of arsenic and radiation that

occurred, has created and enhanced further negative economic impact when coupled with

Defendants' ongoing dishonesty and concealment of ash safety and sporadic leaks at KIF.

227.   Due to their fraudulent pathological untruthfulness regarding prior environmental cover-

ups and the new leaks, a new ongoing nuisance stigma has been further egregiously

aggravated.

228.  The Plaintiffs have lost and continue to suffer loss as potential residents and business ventures choose to locate elsewhere due to the recent release and the environmental uncertainty created by the spill.

229.  Jacobs was negligent by failing to hire and train employees and independent contractors and subcontractors in applicable policies or procedures for working at the Site and for day-to-day safety.

230.  Jacobs was negligent by failing to hire and train employees and independent contractors and subcontractors in public health, operations and management.

231.  Roane County, Kingston and Harriman relied upon Jacobs and the TVA as direct third party beneficiaries to the TVA/Jacobs contract.

232.  Jacobs was negligent for inadequate performance by failing to implement contracted promises to TVA and its site remediators, including contractors and subcontractors, and Roane County along with the Plaintiff municipalities.

233.  Jacobs was negligent for inadequate performance of implementing policies and procedures regarding health and safety as promised to TVA for independent contractors and subcontractors working on the Site, and Roane County relied upon them as a direct third party beneficiary to the TVA/Jacobs contract.

234.  Jacobs was negligent in the construction and implementation of approved safety and health plans for independent contractors working on the Site, and Roane County relying upon them as a third party beneficiary to the TVA/Jacobs contract.

235. Jacobs was negligent in the maintenance and the intentional altering and manipulating of toxic air monitoring results to TVA to create lower permissible exposure limits ("PEL") readings that directly violated TVA directives and its scope of authority, and violating other statutes and regulations, all of which caused injuries to Plaintiffs, and Roane County relying upon them as direct third party beneficiary to the contract.

236. Defendants knew, or should have known, that the previously referenced actions were non-discretionary, as maintaining site safety and adherence with directives, statutes and regulations allowed for no discretionary choice.

237. Jacobs had actual notice of the seriousness of the potential problem with the air monitoring and lack of adequate safety and still chose to take little or no action to prevent serious injury to the plaintiffs and others with windward erosion.

238. The Defendants' negligent acts and/or omissions described above proximately caused and continue to cause damage to Plaintiffs in the form of economic loss, aggravation and inconvenience, lost revenues, medical bills , and other damages - for all of which they are liable in monetary damages.

239. All of these allegations were a factor that caused the damages herein complained to one of the most beautiful counties in the country.

## FIFTH CLAIM FOR RELIEF

### Negligence Per Se

240. Plaintiffs refer to and re-allege Paragraphs 1 through 239 of this Complaint and incorporate them by this reference, as though fully set forth herein.

241. Plaintiffs refer to and re-allege the previously referenced violations of state and federal laws as referenced in the entirety of this Complaint. Jacobs and the TVA violated the following standards of conduct that breached its legal obligations:

    a. 33 U.S.C. Ch. 23, Sec. 11151, *et seq*.

    b. *Tenn. Code Ann*. § 50-3-101, *et. seq*.

    c. *Tenn. Code Ann*. § 50-3-2001 *et seq*. as applied through SARA title III

    d. *The Tennessee State Air Pollution Control Regulations*:

    e. *Tenn. St. Reg*. 1200-3-3;

    f. *Tenn. St. Reg*. 1200-3-5;

    g. *Tenn. St. Reg*. 1200-3-8;

    h. *Tenn. St. Reg*. 1200-3-10;

    i. *Tenn. St. Reg*. 1200-3-11;

    j. *Tenn. St. Reg*. 1200-3-12;

    k. *Tenn. St. Reg*. 1200-3-13;

    l. *Tenn. St. Reg*. 1200-3-19;

    m. *Tenn. St. Reg*. 1200-3-22;

    n. *Tenn. St. Reg*. 1200-3-37; and,

*o.* *The Roane County Natural Hazard Mitigation Plan.*

## SIXTH CLAIM FOR RELIEF

### Temporary Public Nuisance

242. Plaintiffs refer to and re-allege Paragraphs 1 through 241 of this Complaint and incorporate them by this reference, as though fully set forth herein.

243. As a direct and foreseeable consequence of Defendants' wrongful conduct, Plaintiffs have been required to spend millions of dollars each year in its efforts to combat the public nuisance enhanced by Defendants' deceptive marketing campaign, ongoing concealment of the truth, and reckless remediation of the area.

244. The concealed conglomeration of toxins and carcinogens that continue to flow into the groundwater are another means by which the Defendants deceived Plaintiffs.

245. Due to the Defendants concealing of the conglomeration of toxins and carcinogens the general public's annoyance, fear, aggravation, and inconvenience have been heightened.

246. Pursuant to *Tenn. Code Ann.* § 5-1-118 and § 6-2-201, the Plaintiffs further allege that the hidden constituents, their airborne and waterborne migration, including the new leaks into the groundwater of the community are an unreasonable, substantial interference with the public's health, safety and welfare. This constitutes a violation of the Roane Disaster Mitigation Plan,

247. These governmental Plaintiffs are empowered by Tenn. Code Ann. § 6-2-201 to define and regulate nuisances, health hazards, morals, safety, convenience and welfare in order

to protect their inhabitants as a matter of its duties to their citizens and as a matter of their police powers.

248.   Based upon Tenn. Code Ann. § 6-2-201, other statutes, recent court rulings, regulations, common law, and duty to protect its citizens, including but not limited to sensitive population groups (children under 5 years of age, individuals who are immunocompromised, and those over the age of 65) Plaintiffs are empowered to file this Complaint in order toprotect and serve all individuals in the community.

249.   Up and until present day TVA contends that fly ash is harmless, by directly stating that fly ash is safe at a public meeting in Ladd Landing, Roane County, Tennessee on or about Aug. 30, 2018.

250.   The public is temporarily offended and substantially annoyed in an ongoing manner by this temporary nuisance that could have been and can be remediated.

251.   The citizens of Roane County, Harriman and Kingston are substantially annoyed and the community has been wrongfully stigmatized by the Defendants' actions.

252.   Plaintiffs have incurred and continue to incur costs related to fly ash, including, but not limited to, health care costs, criminal justice and victimization costs, social costs, and lost productivity costs.

## SEVENTH CLAIM FOR RELIEF

### Offensive Non-Mutual Collateral Estoppel

253.    Plaintiffs refer to and re-allege Paragraphs 1 through 252 of this Complaint and

incorporate them by this reference, as though fully set forth herein.

254.    Defendants' misrepresentations regarding the safety and efficacy of fly ash proximately

caused injury to Plaintiffs and its residents.  The most recent release of impermissibly

dangerous levels of Arsenic and radiation into the ground water was yet again part of the

pattern and practice of reckless dishonesty and cover up.

255.    The actions of these Defendants exhibit the callous disregard for human life, the

environment, and the entire area that was one of the most beautiful counties in Tennessee.

The previously referenced actions still continue despite a 2011 report from the TVA OIG

(Office of Inspector General) that reprimanded the TVA omission of public safety.

256.    The Defendant The Tennessee Valley Authority admitted through Admin. Order That the

fly ash produced by the TVA facility in Kingston, Tennessee constituted an "imminent

danger to human health" on or about May 11, 2009.

257.    Despite this acknowledgement Defendants have issued hundreds of public statements that

coal combustion residuals (CCR) were safe with the Defendant Jacobs Engineering

Group's most recent release occurring on or about the month of April 2019, at normal

levels, and posed no danger to human health.

258.    By accepting the EPA Agency's determinations in the Agreed Order of Consent, pursuant

to 28 U.S.C. § 1738 requires federal courts to adhere to the doctrine of state agency

decisions and requires even federal courts to give them full faith and credit as verified by

the United States Supreme Court in *Kramer v. Chemical Constr. Corp.*, 456 U.S. 461,466 (1982); *Tenn. v. Elliot*, 478 U.S. 788, 796 (1986).

259. This Order was reinforced by a jury verdict related to the exact factual issues in this case regarding liability and both the Court and Jury rendered merit based factual decisions through the Memorandum opinion in 2012 as it relates to nuisance and the Jury Verdict in 2018 as it relates to dangers to human health.

260. On or about February 6, 2009, TVA entered into a joint venture (enterprise) contractual agreement to manage the CERCLA SUPERFUND toxic cleanup site for TVA.

261. Under Tennessee common law the strict procedural precedent is that the negligence of one joint venturer impugns all others without fault. *Fain v. O'Connell*, 909 SW 2d 790 ( Tenn. 1995 ), *Cole v. Woods* , 548 SW 2d 640 ( Tenn. 1977 ).

262. Defendants, jointly and severally, are bound as members of the joint enterprise.

263. Pursuant to *Sterling v. Velisicol*, 855 F. 2d 1188 (6th Cir. 1988) strict liability is established in this action by the subject of the contract "Ultra Hazardous Activity."

264. Defendants were mandated to protect human life in a disaster that contained fly ash with concealed radioactive materials and over twenty five (25) toxic constituents as designated in the Federal Register as "Toxic" at the KIF remediation site.

265. As a result of hazardous mismanagement at the site on Nov. 7, 2018 a jury returned a verdict of contractually bound Jacobs Engineering Inc., determining that:

a.      Jacobs breached the TVA contract that were designed to protect human health, and;

b.      There were breaches of the Site Wide Safety and Health Plan ("SWSHP") developed by Jacobs and adopted by TVA to be mandatorily followed, comply with law, and to protect the public.

c.      The breaches by Defendant Jacobs were in direct contravention of the mandate to protect the Plaintiffs and their citizens.

266.    Judicial Estoppel is present as the issue of fly ash causing harm to human health has been established through internal documents, Administrative Order, and Verdict by jury

267.    Pursuant to *Sterling v. Velsicol,* 856 F2d (6th Cir. 1988) chemical hazards such as fly ash constituents are subject to strict liability as they pose an imminent danger to humans and constitute a public nuisance.

268.    This Court can take Judicial Notice that TVA and Jacobs concealed the dangers of fly ash from the public and tried to assure the public fly ash controlled, handled, transported, and arranged for disposal by the Defendants is a temporary public nuisance.

269.    On or about August 23, 2012 the District Court for the Eastern District of Tennessee entered a Judgment/ Memorandum Opinion stating that TVA was liable for negligence in handling fly ash regarding the issue of liability for property damage based open theories of nuisance.

270. The same claim is present in this action and has been reinforced by the recent jury verdict of November 7, 2018 designating the breaches of duty referenced and a jury determination that fly ash can harmful to human health if inhaled, ingested, or is in contact with eyes or skin.

271. TVA has recently admitted that there are currently impermissible levels of arsenic and radiation in the Roane County groundwater after yet another attempt to conceal the contamination.

272. This mutual ongoing conduct enhances yet an ongoing temporary public nuisance and inquiry upon the community of Plaintiffs, who's citizens are undeserving of such and without fault.

273. The Jury Verdict of November of 2018 rendering Jacobs Engineering Group, Inc. breached its contract with TVA as its Manager of the CERCLA Superfund Site at KIF, breaching its obligation to protect human health in accordance with the TVA contract and its own Site Wide Safety and Health Plan that Jacobs created.

274. The jury in *Adkisson v. Jacobs Engineering*, EDTN 13-cv-505, determined that the fly ash could cause a myriad of injuries as referenced in the verdict form including hypertension, coronary artery disease, lung cancer, leukemia and other hematologic malignancies, skin cancer, allergic contact dermatitis, peripheral neuropathy, asthma, chronic obstructive pulmonary disease, and respiratory conditions, including cough, sore throat, dyspnea on exertion, chest pain or discomfort, bronchitis and emphysema.

275.    Defendant Jacobs Engineering should be estopped regarding any issues regarding the breaches of the TVA contract, and a court able to take judicial notice that the conditions resulting from the breaches are at minimum a nuisance and dangerous. In this regard Jacob's coverup of these conditions enhances an uncertainty and distrust of any issues involving safety, that harms Plaintiffs.

276.    Pursuant to *Brown v. Arnold*, M2015-00762-SC-R11-CV ( Tenn. 2016) the Plaintiffs include a request that TVA should also be bound by the doctrine of offensive non-mutual collateral estoppel to prevent the Defendants from re-litigating these issues under *Brown* as a matter of policy, justice, and judicial economy based upon the following grounds:

    a.    The Plaintiffs were precluded from litigating the same issues by the fraudulent concealment of the Defendants by refraining from action for being induced to believe fly ash was safe.

    b.    The issues, fact, and laws were collectively substantially the same and encompassed in fact and law determinations in the prior proceedings so referenced above.

    c.    A ruling in favor of the Plaintiffs prevents re-litigation of the same and internal documents uncovered in the prior proceedings are basically hidden admission kept from the public that admit knowledge and liability of the Defendants.

    d.    Rapid conclusion is in the public interest and saves tax dollars.

    e.    The Defendants misrepresented the dangers of fly ash precluding the Plaintiff's from being joined in the prior litigation.

f.      Treating the issues regarding liability as determined serves the rate payers that deserve integrity and contract compliance of profiteering contractors that act outside the scope of law, societal purpose, policy, and a requisite levels of humanity.

g.      At minimum Jacobs should be estopped due to their level of reckless disregard for the Plaintiffs and others. They should not benefit from such a heightened level of unclean hands.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues raised herein. *Thacker v. TVA*, 868 F. 3d 979.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray judgment against Defendants as follows:

A.      For fair compensatory damages from these Defendants which were incurred by Plaintiffs for the ongoing temporary nuisance, lost revenues, all physical injury response cost, disease response costs, fatal illness costs and response costs, the contractually promised medical response expenses as promised by the TVA, any further, medical response costs, emergency response cost, any other further response monies to which Plaintiffs and their citizenry are entitled. Further, the Plaintiffs pray for all response cost damages in accordance with the EPA AOC, the TVA/Jacobs contract, and law as a whole, and all other damages to which the Plaintiffs are entitled.

B.      For punitive damages in any amount a Jury determines or Court determines to be fair

against Defendants as appropriate and/or treble all other damages to which the Plaintiff's may

fairly be entitled.

C.      On all Claims for Relief, such other and further relief as this Court deems just and proper

under the circumstances.

D.      Plaintiffs reserve the right to amend this Complaint against all parties, as the facts,

through discovery, should warrant.  Plaintiffs also hereby move in the spirit of the rules of the

Eastern District of Tennessee that before any dispositive motions are filed at the onset of this

case, pursuant to Fed. R. Civ. P. 12,  that the parties confer in order to resolve any perceived

conflict in pleading in the interest of judicial economy. Further, before the filing of any

dispositive motions Plaintiffs would herby move for an adequate time for discovery.

E.      Plaintiff's, additionally move for attorneys fees and to all other relief to which it is

entitled referenced in the preceding or otherwise in a fair amount determined by a jury not to

exceed all damages in the amount of nine hundred million dollars ($900,000,000.00) or any other

amount at all that is rendered as fair exclusive of damages deemed as punitive against these

Defendants, jointly and severally.

F.      For such other, general relief to which these Plaintiffs may be entitled.

        Respectfully Submitted, this _____ day of _____, 2019.

                        /s/ James K. Scott

/s/ Keith D. Stewart

/s/ J. Tyler Roper